(Surrogates' Court, New York County. October 9, 1913.)

1. WITNESSES (§ 140*)—COMPETENCY—EXECUTRIX—CLAIMS FOR INDEBTEDNESS PAID.

Where an executrix paid claims of her husband against testator for counsel fees and money loaned, she was incompetent to testify to a conversation between testator and her husband in support of the claims on objections being made to her claim of credit therefor in her account, under Code Civ. Pro. § 829, declaring that a person shall be incompetent to testify as to transactions and communications with persons since deceased, etc.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 598–618; Dec. Dig. § 140.*]

2. WITNESSES (§ 140*)—COMPETENCY—EXECUTRIX—CLAIMS FOR INDEBTEDNESS PAID.

A creditor of a person since deceased, whose claim has been paid by the executrix, is a competent witness in her favor to establish the claim in order that the executrix may be allowed credit therefor in her account.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 598–618; Dec. Dig. § 140.*]

3. EXECUTORS AND ADMINISTRATORS (§ 221*)—CLAIMS—PROOF—UNSUPPORTED TESTIMONY OF CLAIMANT.

A claim for money loaned to testator and for legal services rendered to him during his lifetime, not sustained by any written evidence, could not be established by the uncorroborated evidence of the claimant and his wife, who should be regarded as parties in interest.

[Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. §§ 901–903½, 1858, 1861–1863, 1865, 1866, 1871–1874, 1876; Dec. Dig. § 221.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

4. EXECUTORS AND ADMINISTRATORS (§ 221\*)—CLAIMS—EVIDENCE—RELEVANCY
    —SURROUNDING CIRCUMSTANCES.

> On an issue as to whether a loan had been made by an attorney to his
> client, since deceased, evidence of circumstances surrounding the client
> at the time, showing that he was not in necessitous circumstances or in
> need of money, was admissible, especially where there was no written evi-
> dence of the loan.

> [Ed. Note.—For other cases, see Executors and Administrators, Cent.
> Dig. §§ 901–903½, 1858, 1861–1863, 1865, 1866, 1871–1874, 1876; Dec. Dig.
> § 221.\*]

Judicial settlement of the account of Agnes K. Mulligan, as execu-
trix of John Hartmann, deceased. Objections having been filed to
credits claimed by the executrix for payments made by her to her hus-
band for a counsel fee, for money alleged to have been loaned, and
for services rendered to the testator in his lifetime, such claims, ex-
cept as to the counsel fee of $250, were expunged after hearing.

William A. Keating, of New York City (Leslie J. Tompkins, of New
York City, of counsel), for executrix.

Osborne, Lamb & Garvan, of New York City (Gilbert D. Lamb, of
New York City, of counsel), for contestant.

FOWLER, S. Judgment has been long delayed in this matter, in
which objections were filed to the account of the executrix and the
hearings on the objections brought on before the surrogate. The hear-
ings were very prolonged, the evidence is voluminous, and the matter
has already occupied too much time, to the prejudice of important mat-
ters pending in this court. It is only in much poorer estates than this
that the surrogate can be expected to hear in person such matters as
those here involved. Such matters are referable properly to referees
designated for the purpose.

The executrix in her account charges herself with property in the
sum of $18,653.50. This is the dead man's estate. She credits herself
with the payment to her husband of $250 counsel fee and expenses of
administration. Mr. Mulligan is an attorney and counselor at law
and, as it happens, the husband of the executrix herself. She also
credits herself with $315 paid to William A. Keating for the collec-
tion of a $3,000 note with interest, and with the large sum of $7,075.-
33 paid to the said William G. Mulligan for disbursements, money
claimed to have been loaned by him to John Hartmann, the deceased,
during his lifetime and for professional services said to have been ren-
dered by Mr. Mulligan to the late Mr. Hartmann during the latter's
life. The widow of the deceased, who is in law entitled to all the sur-
plus over the debts, has filed objections to these three items just no-
ticed. The objection to the item of $315, paid to William A. Keating
for the collection of the $3,000 note, was, however, withdrawn upon
the hearing and is out of the case.

The testimony given in on the disputed items discloses that the de-
ceased had considerable domestic trouble of no very serious kind. He
and his wife in later life disagreed about money and they were at times
not on the best of terms, and it is claimed that Mr. Hartmann was

fearful that Mrs. Hartmann would obtain possession of some of his property, of which he was very careful, and he was desirous of placing the estate that he possessed so as to prevent his wife from gaining control of any of it. It is conceded that Mr. Hartmann had been arrested in New Jersey for an assault on his wife. This was hardly due to his wife's action. The public authorities were responsible for this prosecution. In any event, then it was that a friend of Mr. Hartmann and Mr. Mulligan told Mr. Hartmann that Mr. William G. Mulligan, an attorney and counselor at law at No. 461 East Tremont avenue, in the borough of the Bronx, was a good man and that he had better go to call on this lawyer, who would probably be able to advise him in his difficulties. The deceased accordingly called on Mr. Mulligan professionally and had many conferences with him. Mr. Mulligan about this time drew a will for the deceased, in which Agnes K. Mulligan, the present executrix, Mr. Mulligan's wife and associate with him in business, was named sole executrix. In time Mr. Hartmann came to die, and Mrs. Mulligan as the sole executrix named in the will took charge of his estate and almost immediately proceeded to pay out of it to her husband, as she states in her account, the relatively large items which are now objected to by Mrs. Hartmann, the testator's widow, and which are the subject of this judicial investigation before me. It may be that the close relationship existing between Mr. Mulligan and the executrix did not influence her action in the premises; but certainly this relationship and the circumstances hereafter indicated are quite sufficient to place upon her the burden of showing the propriety of payments by her to her own husband most clearly and by good and preponderating proofs. I am surprised that educated persons of delicate sensibilities should have allowed themselves even to drift into the position disclosed on the hearing in this matter and by the account of the executrix. The executrix herself was trained in the law. As persons trained in the elevated and most responsible profession of the law, both Mr. and Mrs. Mulligan ought willingly to bear the burden if they are unable fully to discharge the obligation cast upon them by even unfortunate or unfavorable circumstances. In respect of the execution of trusts by lawyers, I am inclined to be very strict in my inferences, as lawyers particularly are bound by professional obligations, in addition to the obligations ordinarily imposed by conscience and good faith on trustees. The dignity of the profession of the law and the welfare of society are not promoted by any indulgence to lawyers in respect of their dealings with their clients. In such matters the lawyers' proofs should be always high in order to prevail in this court.

[1] In a proceeding of this character, the accountant executrix, who has paid bills of the kind objected to, is in law held incompetent to testify to a conversation between the payee and the deceased, if she seek to be allowed the payment of such bills. Section 829, Code Civ. Pro.; Matter of Smith, 153 N. Y. 124, 47 N. E. 33; Matter of Knibbs, 108 App. Div. 134, 96 N. Y. Supp. 40.

[2, 3] But it has been held that the party whose claim is paid is competent to testify, as he is not a party to the proceeding or interested in the event, nor does the executrix derive title through or under such

creditor. Section 829, Code Civ. Pro.; Glennan v. Rochester Trust, etc., Co., 152 App. Div. 316, 136 N. Y. Supp. 747; Matter of Frazer, 92 N. Y. 239. I was at some pains to follow these precedents on the hearing, although to my mind both Mr. and Mrs. Mulligan would have been incompetent as witnesses at common law, which seems to me to afford the more just rule. The Code and the rulings of our courts thereon have, however, rendered Mr. Mulligan competent to give evidence of these transactions with the late Mr. Hartmann, and these rulings I obeyed. But Mr. Mulligan's testimony is insufficient of itself. He is virtually the claimant against the dead man's estate, and the unsupported testimony of claimants is generally regarded as insufficient in such cases. Beckett v. Ramsdale, L. R. 7, Ch. D. 177.

The principal issues concern the validity of the claims for professional services rendered by William G. Mulligan during the lifetime of the deceased, amounting to $4,655.33, and the amounts paid William G. Mulligan for moneys loaned to John Hartmann during his lifetime, amounting to $2,380, both of which large items were paid by the executrix; she then being the wife of the alleged creditor. These she paid quickly, though the account discloses she contests the funeral bill for the burial of Mr. Hartmann. The claims in question are supported solely by the testimony of Mr. and Mrs. Mulligan and Edward Mulligan, a brother and employé of Mr. Mulligan. No written contract between Mr. Mulligan and Mr. Hartmann, as to amounts to be charged by Mr. Mulligan for his alleged professional services, was produced, and I do not think that there ever was such a written contract. These professional services are set forth in the bill of particulars and are as follows: For the collection of $14,303.35 from Pratt & McAlpin, former attorneys for Mr. Hartmann, $1,430.33. It appears that this particular sum was out on bond and mortgage; that Pratt & McAlpin, attorneys for John Hartmann, really collected this money from the mortgagor; and that Mr. Hartmann desired only to take possession of this money, and almost all that Mr. Mulligan did was to make an oral demand on Messrs. Pratt & McAlpin by calling them up on the telephone and telling them that he wanted the money paid over on behalf of Mr. Hartmann. The money was speedily paid over, but not, I think, through Mr. Mulligan's professional activities. Yet for this Mr. Mulligan charged the estate $1,430.33, pursuant, as he testifies, to an agreement with Mr. Hartmann that he was to receive 10 per cent. of whatever he collected. That Mr. Hartmann could ever have agreed to pay to Mr. Mulligan 10 per cent. for the collection of money I am not thoroughly persuaded. At least I think more evidence is required in law in this instance. The money then belonged to the thrifty Mr. Hartmann and was merely resting in the hands of his former attorneys, Messrs. Pratt & McAlpin, by reason of their having collected the principal when the mortgage held by Mr. Hartmann fell due, and was paid off in due course. Messrs. Pratt & McAlpin were always ready to pay it over on demand. If Mr. Hartmann agreed to pay the 10 per cent., certainly Mr. Mulligan is entitled to receive it, but the only evidence as to this agreement was given either by Mr. Mulligan himself or by Mrs. Mulligan, both interested witnesses. It

seems to me that this is not enough in this case, as the circumstantial evidence rebuts this claim sufficiently to put Mrs. Mulligan, the executrix, to better and more disinterested proof of this item than any disclosed on the hearing.

The balance of the claim paid to Mr. Mulligan for his counsel fees is made up of services rendered by him from January 1, 1907, to March 4, 1909, and there are very few days in all that time, according to the very rough and inartificial bill of particulars furnished by Mr. Mulligan, that Mr. Hartmann did not call and spend at least two hours and sometimes as high as six hours in conference with Mr. Mulligan. What they talked about is not disclosed. It is true that Mr. Hartmann had been arrested for assaulting his wife and that Mr. Mulligan performed some slight professional services with reference to this arrest in New Jersey, but both Mr. and Mrs. Wenninger testify that Mr. Mulligan said he would make no charge for such services. It appears that divorce proceedings were also threatened by Mrs. Hartmann, and that then Mr. Mulligan prepared agreements between John Hartmann and his wife in an attempt to settle their matrimonial differences. Mr. Hartmann and his wife were, as matter of fact, finally reconciled, and an agreement was signed by which Mrs. Hartmann was to receive certain moneys, viz., $40 a month. No divorce proceedings were begun.

[4] Mr. Mulligan also drew a will for the deceased, but all the other professional services rendered by him on his own showing consist of conferences. As Mr. Hartmann's estate was not great and his condition in life was that of a relatively poor man, the subject-matter of these conferences could have been of no great importance. The fact was that Mr. Hartmann was induced to occupy rooms over the business office occupied by Mr. Mulligan and his wife. Mr. Hartmann himself thus was a neighbor and not engaged in any business. He had been prior to this, I believe, a tailor by occupation and had amassed some little estate. It would appear from the bill of particulars that Mr. Hartmann, being out of business, stopped at the Mulligan office nearly every day; in fact, the bill of particulars shows that from 1907 to 1909 he was apparently charged for almost every minute of the time he passed with Mr. Mulligan. All these conferences and services outside of the collection of the $14,303.35, for which $1,430.33 was charged, are aggregated and a lump sum of $3,255.33 charged. Mr. and Mrs. Mulligan alone testify to the value of this kind of professional services. No proof is given that any bill was ever rendered for them to Mr. Hartmann, except the testimony of Mr. and Mrs. Mulligan themselves that they gave him a statement of some kind. The statement in question was not, however, found among Mr. Hartmann's other papers. To my mind, the circumstantial evidence on this point, offered in behalf of the dead Mr. Hartmann, is not consistent with the evidence of Mr. and Mrs. Mulligan. At the time of his death Mr. Hartmann had not a bill outstanding, except $30, due to a doctor for services during his last illness. He was a careful, thrifty, prompt payer of debts, was Mr. Hartmann. This, it is argued, would indicate that Mr. Hartmann was a man who paid all his bills when they were

presented and did not let them accumulate for two or three years, as in this instance in dispute.    Indeed, Mr. Pratt, his former attorney, testified that Mr. Hartmann always insisted on moderate charges and on paying his law bills immediately.    In such a case as this, the testator's circumstances are, I think, some evidence according to precedent.    Dowling v. Dowling, 10 Ir. Ch. L. R., 236.

The item of $2,380, money said to have been loaned to Mr. Hartmann by Mr. Mulligan between March 23, 1907, and January 30, 1908, is made up as follows:    March 23d, loan to Mr. Hartmann, $800; April 2, 1907, $40; January 3, 1908, $40; January 24, 1908, $400; January 25, 1908, $275; January 27, 1908, $100; January 29, 1908, $400; January 30, 1908, $325.    No vouchers whatever were produced corroborative of these alleged loans.    The only proof that this money was ever loaned to Mr. Hartmann is the testimony of Mr. Mulligan and his wife and Edward Mulligan, a brother of Mr. Mulligan.    The transactions were stated, I think, to have been in cash.    Mrs. Mulligan testified that at the time each loan was made a receipt was taken, and that these receipts were all lost.    This is most unfortunate under the circumstances for this executrix, for at the time of these alleged loans to Mr. Hartmann it appeared that Mr. Mulligan was in the possession of a $10,000 mortgage made or assigned to Mr. Hartmann and of $4,000 in cash, for which he had given Mr. Hartmann a promissory note, signed by himself and his wife, this executrix.    It seems extraordinary that if Mr. Mulligan had then $4,000 of Mr. Hartmann's money on hand that Mr. Hartmann should wish to borrow money from Mr. Mulligan.    The explanation of this discrepancy, given by Mr. Mulligan himself, is that Mr. Hartmann had agreed to the payment of $40 a month to his wife, and that Mr. Hartmann wanted to keep his money intact, so as to produce a sufficient income to meet the agreement with the wife, and that he did not want to break into his principal in any way, and besides that he did not want his wife to know that he was possessed of this money.    To my mind any one of these reasons surpasses three.    It does appear also from the testimony of Mr. Wenninger that he had paid Mr. Hartmann $700 in cash just before Mr. Mulligan states he let Mr. Hartmann have $800, and it also appears that Mr. Hartmann had had in cash at that time $303.35 out of the $14,303.35 collected from Messrs. Pratt & McAlpin.    Now, Mr. Hartmann was in no business at that time, and his mode of life was very small.    This would indicate that there was no apparent necessity for Mr. Hartmann's procuring a loan at that particular time from Mr. Mulligan.    This is of course very negative evidence, but it finds some support in the books.    Dowling v. Dowling, supra.

In regard to the $250 counsel fees paid to Mr. Mulligan in the matter of the probate of the will and the transfer tax and the accounting, etc., I think the objection should be overruled, as that is a fair and reasonable sum.

I am of the opinion, in so far as the objection to the payment of counsel fees in the sum of $4,655.33 is concerned, that an allowance of $250 to cover all, including the collection of the $14,303.35 from Pratt & McAlpin, would have been ample compensation for Mr. Mulli-

143 NEW YORK SUPPLEMENT

gan, and that amount I am willing to allow to the executrix, but no more. With regard to the loans alleged to have been made by Mr. Mulligan to Mr. Hartmann, amounting to $2,380, I am convinced that insufficient evidence has under the circumstances of this case been given to sanction their repayment by the executrix out of the funds of the estate, and that the executrix should be surcharged in her account with the amount of the same. Settle decree accordingly.