In the Matter of the Estate of ELLEN R. LONG, Deceased.

Surrogate's Court, Livingston County, June 27, 1932.

*Fred A. Quirk*, for the petitioner.

*Edward A. Noble*, for the claimant.

WHEELER, S. This is a proceeding to determine the merits of the claim of Laura FitzPatrick, as administratrix of the estate of Catherine FitzPatrick, deceased, as a part of the judicial settlement of the estate of the late Ellen R. Long.

The claimant filed a claim for $1,325 against the above estate for alleged services rendered by Catherine FitzPatrick in nursing and caring for Ellen R. Long, her sister.

It appears that Ellen R. Long died May 13, 1930. Catherine FitzPatrick died February 20, 1927, and the claim for services presented August 14, 1930, runs back to November 4, 1924.

Ellen R. Long, the decedent, resided in the village of Geneseo, where she maintained a home and rented rooms to students; her sister, Catherine FitzPatrick, was a widow and resided in an adjoining town, and for some years prior to her death had been a practical nurse.

The executor rejected the claim and opposed the payment upon the grounds that the alleged services were rendered by a sister of the decedent and were, therefore, gratuitous, in the absence of exact evidence of an agreement to compensate; and upon the further ground that the claimant has failed to prove facts sufficient to establish her claim.

The claimant offered proof to the effect that the sisters were living separate and apart and that while the decedent was at the home of her sister, Catherine FitzPatrick, she was taken with one of her spells of sickness, and when she returned to her home at Geneseo in the fall of 1924, the claimant's decedent returned with her to care for her and her household and that under such circumstances the claimant became entitled to recovery for the services claimed.

The evidence bearing upon this contention is found in the testimony of Dr. Collins, who testified that he attended the decedent at the home of her sister, Catherine FitzPatrick, in East Avon, in the summer of 1924, and who was then confined to her bed; that she gradually improved and returned to her home in Geneseo in the fall of 1924 and Mrs. FitzPatrick went back with her to care for her and her household.

The burden of proof in this proceeding rests entirely upon the claimant. This burden must always be sustained and unless the evidence submitted is sufficient to establish the claim in every essential detail, it should be dismissed.

In satisfying this rule, the proof must be clear, definite and certain as to the services rendered, the time employed and the

contract which fixes the price, or in lieu thereof facts sufficient to establish an implied contract whereby the fair and reasonable value of such service can be determined.

The claimant produced three physicians upon the trial.

Doctor Collins, of Avon, who testified in relation to the decedent's physical condition that she had diabetes and heart lesions, and that her condition was such as to require the services of a practical nurse; that he was there three or four times at her home in Geneseo, but made no visits during the time covered by the claimant's claim; that the understanding was that the decedent was to return to her home in Geneseo and that Mrs. FitzPatrick was to go with her and care for her;

Doctor Lauderdale, who testified in substance that he was not the physician in charge and was called in occasionally when her regular physician was unable to attend her, but was unable to testify as to any visits made during the period covered by the claim presented;

Doctor Newton, the physician in charge, who testified that he attended her from February 2, 1926, until she passed away on May 13, 1930, and that she suffered from heart trouble, diabetes and high blood pressure. He would not say what dates he was there; that she came to his office a few times for medicine; that he saw Mrs. FitzPatrick about the home of Miss Long, but could not swear that she was there at any particular time; that during decedent's sick spells she required the services of a nurse.

His testimony was indefinite and uncertain as to calls made by him and the periods of decedent's sicknesses.

Students who were roomers at the home of decedent during the periods for which claim is made were produced upon the trial and testified that they saw Mrs. FitzPatrick about the home during the periods in question and observed her assisting Miss Long in and about the necessary work;

That Miss Long occupied two or three rooms which she shared with Mrs. FitzPatrick and that the housework was shared by these two women and on occasional sicknesses had by Miss Long, Mrs. FitzPatrick was observed performing minor duties, such as giving her medicine or caring for her;

That they did their own work, cooking and caring for their rooms and furnished their own bed linen.

Neighbors were produced, who testified as to what they observed relative to services rendered by claimant's decedent.

George E. Thompson testified that he lived near the decedent's home and according to his recollection the decedent had three sick

spells, about a year apart, and that he saw claimant's decedent about the house.

Other neighbors were produced, who testified in substance that they saw Miss Long, the decedent, about the home performing her usual household duties; saw her about on the streets and walking to church and about her marketing during the periods covered by the claim, with the exception of possibly small periods when she was confined to her bed.

The neighbor, Belle Snyder, testified in substance: " That she was well acquainted with Mrs. FitzPatrick and with Miss Long and that she saw Ellen Long practically every day.

" That if she had a bad spell they would send for her if Mrs. Delaney was not there. That she saw her about the street and in the market; that she knew her physicial condition.

" That she [Mrs. Snyder] had had experience as a practical nurse; that the decedent would at times have bad spells, but that her general condition was good.

" That she observed her doing her own cooking as a rule, and doing her own housework; that she always did her own work until towards the last; that she frequently talked with Mrs. FitzPatrick and that Mrs. FitzPatrick had said to her that she had lost her tenant at East Avon, who had been occupying her home and that she wanted to do some nursing and thought she would like to keep house for some old couple; that she did not feel able to heat her own house during the Winter and wanted some work to do. This was just a little while before she died.

" That she [Mrs. FitzPatrick] was living with Miss Long off and on, but not steady, and that she would like to get a place where she could keep house for an old gentleman or an old couple. That she had lost her tenant and needed the money and could not afford to heat the house at East Avon."

And further testified: " Q. Did she say anything to you about closing her house and going to Geneseo? A. No, but she said she would like work for her to do and that Ellen did not need her [meaning decedent]. Q. Was that all in the same conversation? A. Yes; that the house was so crowded and full of students and Mrs. Delaney used to make it her home. Q. She said Ellen did not need her? A. Yes, that is what she said. Q. As you understand it, what was there to do there? A. They just had two rooms; there was not much to do; the students took care of their own rooms. Q. What do you mean when you say there was not much to do? A. Miss Long's work was so simple, there was not much to do. Q. It was a ten room house? A. Each student took care of her own room and she did not have a thing to do —and

they furnished their own linen and everything. Q. These two women had a couple of rooms? A. They practically lived in there — in their kitchen. Q. Kitchen and one room? A. And bedroom in the rear. Q. These students did their own work and furnished their own linen? A. These students used her kitchen and had to clean it up; they cooked down stairs and some cooked up stairs and those down stairs had to clean up their messes. Q. On that basis you made that statement that there was not much to do? A. I think Miss Long managed her work nicely; her students liked her and did things for her. Q. Do you remember Mrs. FitzPatrick being in ill health before she left her home? A. No, but they always said she was not well. Q. Don't you know about when Mrs. Fitz-Patrick left the Long home? A. I can't picture Mrs. FitzPatrick staying there any length of time at any time; she would come and go; I can't remember her being there to exceed a week. Q. That is no answer; for instance, how many times a week would you see her during this period? A. Which one? Q. Miss Long? A. I could not help but see her every day, maybe two or three times a day; if I was in the front part of my house and she was. Q. During what period? A. Most any time of day. Q. From the Fall of 1924 to the Winter of 1927? A. Practically every day; and lots of times more than once a day; she was alone is one reason I saw her so much. Q. You don't know what became necessary for her care during the time she had the spells — you don't know what had to be done? A. I happened to be called there myself. Q. She had a great many of them? A. She had hard breathing spells, and in a few minutes was over it and doing her work.''

The record discloses that the claimant's decedent was living at the home of her sister and apparently received her board and lodging without charge, and that she rendered in turn services as would constitute the usual and natural acts or services and kindnesses which one sister would render to another, either in sickness or in health, and their benefits were mutual.

The situation developed implies very strongly that there was no promise to compensate for such services on the part of either, nor any expectation for compensation.

It appears further that when decedent died in 1930 she had in cash upwards of $2,000 and that the financial condition of claimant's decedent was such that it was necessary for her to rent her home, as she did not feel able to pay the expenses necessary to maintain it during the winter months and the evidence discloses that she did rent her home and did spend her winter months with her sister, the decedent, and it is during those periods that her administratrix seeks compensation.

It was shown that there was very little work to be done about the home of the decedent and that there were only occasional periods of time when she required any special attention. It appears that Catherine FitzPatrick was in need of money and it is worthy of note that she failed to present any claim during the entire period for which compensation is sought, and that decedent was in a position to pay at all times for such services and had a reputation for paying her obligations promptly, and even after the death of Catherine FitzPatrick, the administratrix of her estate failed to present a claim against decedent during her lifetime, who survived her sister for upwards of three years. Apparently the administratrix preferred not to assert the claim in suit until she had learned how Catherine would fare under her sister's will.

The fact that no claim was made in this case until after decedent's will had been made public, indicates that the services were such as would be naturally given, by reason of relationship and affection, and for which no compensation was expected. (*Rock* v. *Rock*, 105 App. Div. 157.)

Claims are viewed with great suspicion where they are withheld for several years after the services are rendered, and until death renders contradiction of the decedent impossible. (*Lyon* v. *Smith*, 142 App. Div. 186; *Matter of Hart* v. *Twite*, 75 id. 323; *Matter of Otis*, 126 Misc. 741.)

The basis of a recovery for personal services must be a contract express or implied. If the contract be not express it may be implied from the rendition and acceptance of the service. Then the presumption is created that such services were to be compensated. If, on the contrary, it be the natural thing, because of the relationship of the parties that the services be performed without expectation of pay, then there is no such presumption. (*Fox* v. *Arctic, etc.*, 229 N. Y. 124; *Robinson* v. *Munn*, 238 id. 40, 43.)

In *Matter of Flood* (133 Misc. 77) a claim was presented by a surviving sister to the decedent for services as a nurse and housekeeper. The court disallowed the claim and in the course of its opinion in part stated: " The only inference to be drawn is that the services were gratuitously rendered as a matter of affection and natural duty. Nor under the circumstances developed here, was there any implied obligation to pay for the services. Where there is a close relationship between the claimant and the decedent, the presumption is customarily invoked that the work was not to be paid for." (*Collyer* v. *Collyer*, 113 N. Y. 442; *Matter of Dole*, 168 App. Div. 253; *Platt* v. *Hollands*, 85 id. 231; *Smith* v. *Burhyte*, 197 id. 725.)

The courts regard with suspicion and disfavor claims brought against an estate for personal services rendered by relatives,

especially where the latter are members of decedent's household, as the presumption is that such services between persons occupying such relationship are intended to be gratuitous. (*Collyer* v. *Collyer*, 113 N. Y. 442; *Matter of Zegel*, 171 App. Div. 513; *Seaman* v. *Jamison*, 158 id. 832; *More* v. *Shepard*, 133 id. 471; *Matter of Goss*, 98 id. 489; *Platt* v. *Hollands*, 85 id. 231; *Matter of Babcock*, 169 N. Y. Supp. 800; affd., 185 App. Div. 906.)

Suspicion by the court, however, is never justified, but the complete proofs are to be analyzed and the issues fairly determined upon the sufficiency of the evidence. By reason of the death of one of the parties they are disproven with difficulty. The law wisely scrutinizes the circumstances in such cases in order " To prevent such raids upon the estates of decedents." (*Butcher* v. *Geissenhainer*, 125 App. Div. 272.)

The courts have frequently characterized the dangerous nature of claims asserted by persons for the first time after the death of decedent against estates and have observed in that connection the savings of a lifetime may be taken from the heirs by the testimony of interested witnesses. (*Donnarumma* v. *Potter*, 211 App. Div. 54; *Ennis* v. *Chichester*, 187 id. 53; affd., 227 N. Y. 663.)

In determining the validity of a claim presented against the estate of a decedent it is for the court to take into consideration all of the facts and surrounding circumstances, such as the relation of the parties, the nature of the claim presented, the financial conditions, etc., in arriving at a conclusion. (*Caldwell* v. *Lucas*, 233 N. Y. 248; *McKeon* v. *Van Slyck*, 223 id. 392; *Ward* v. *N. Y. Life Ins. Co.*, 225 id. 314.)

The decisions referred to have firmly settled the rule that claims against the estate of decedents presented by a near relative and withheld until after the death of one against whose estate such claims are sought to be enforced, will be scrutinized with great care and will be sustained only when supported by the most clear, convincing and satisfactory proof.

The facts here presented for the consideration of the court failed to measure up to the degree of proof required and cannot be treated as coming within the classification of the " clear, convincing and satisfactory evidence," essential to sustain a claim of a relative never asserted during the lifetime of alleged debtor, and only presented after death had foreclosed the debtor's ability to defend.

Public policy requires that claims against the estate of a decedent should be established by very satisfactory evidence and the courts should see to it that such estates are fairly protected against unfounded and rapacious raids. (*Van Slooten* v. *Wheeler*, 140 N. Y. 624.) Public policy demands that the estates of deceased persons

shall not be raided by persons claiming that which they have never asserted in any manner during the lifetime of the deceased and suspicion justly attaches to claims extending over a long period of time and which remain unasserted until after the death of the person who is alleged to have incurred the obligation. (*Matter of Doubleday*, 173 App. Div. 739; affd., 220 N. Y. 590.) Especially when the claims are in favor of a near relative to decedent should they be very carefully examined and only on most satisfactory proof. (*Matter of Goss*, 98 App. Div. 489.) That a claim presented to a decedent's representative was never presented to the decedent in his lifetime suffices to cast suspicion on its validity, and the court cannot sanction its payment except on satisfactory proof of its validity. (*Maisenhelder* v. *Crispell*, 105 App. Div. 219.)

In this proceeding the surrogate has sought to apply to the evidence the rule as to the degree of proof required in this class of cases as laid down in the foregoing authorities.

The claim is, therefore, disallowed in its entirety, without costs.

Submit decree dismissing the claim upon the merits and settling the account accordingly.